Kirkpatrick, C. J.
Much time has been spent in the argument at the bar to show that Stephen Mulford, [*] the devisee, who took by devise, and therefore as a purchaser, was the person last actually seized; and that therefore he must be considered as the propositus, or common stock from whom the inheritance must descend, and not Mary Mulford, his sister, who took by descent. — This I apprehend, has been the more insisted upon in order to get the case clear of the opinion rendered in Den v. Urison ;* and also to give it the favor of what is reported to have been said by my brother Rossell in that case, to wit: That if Wright, the person there left seized, had himself acquired the estate in question, he should have thought that it would go to his sisters, of the half-blood by the mother’s side, and by a different father. But what is ascribed to the judge in that report of the case, was never actually expressed by him on the bench, and the manner in which it got into the report was fully and satisfactorily explained on the hearing. †
I confess I do not clearly comprehend the reasoning of the counsel in this part of his argument. The devise contained in the case, to make the most of it in his favor, is a devise of an estate to the wife during widowhood, with remainder in fee to the grand-son Stephen; a remainder in fee too, vested, and not contingent. Now no principle can be more familiar than that the possession of the tenant of the particular estate, if it be an estate for years, or his seizin if it be an estate of freehold, is the possession or seizin of the remainder-man; and that because there can possibly be no other during the continuance of such particular estate. Indeed if there be a rent reserved during such particular estate, the remainder-man, in order to make out his possession or seizin, must show that he was in the receipt [*] of such rent. But here there was none. The widow enjoyed without render of any kind. Stephen, therefore, by the nature of the devise, was actually seized of his remainder in the seizin of his grand-mother. Her seizin, which was manifestly an actual seizin, was his seizin, and dying so seized, his estate descended to his sister Mary, who, upon the descent cast, become seized in like manner, and so continued till her death.
The law never could be guilty of such an absurdity as to defeat a remainder, because the remainder-man was not, *366 himself, actually seized in the sense here contended, during tlie continuance of the particular estate. It would be requiring, in a case like this, an absolute impossibility, which can never be supposed.
Mary Mulford, therefore, named in the case stated, is to í».e considered as the propositus or stock from whom the inheritance descends; But whether Mary or -Stephen, it will not make the least difference in the view I shall take of the case. If I am right in this, the question which presents itself for consideration, has already been decided in this Court, in the case of Den v. Urison. But as there was a difference of opinion on the ben.ch in that case, and as the person last actually seized being a purchaser, or taking by descent, may he thought to make some difference as to the inheritance, I must beg leave to express my opinion a little more fully, with the reasons on which it is founded.
The lessors of the plaintiff, being the brothers and sister of the half blood by the mother’s side, claim this inheritance against the patraus or uncle by the father’s side; and this without any pretence, as is manifest from the case, that the said inheritance descended from the mother.
In order to place this question in the clearest light, it would be necessary to take a view of the rules of descent as contained in the common law; to show the reason of excluding the half-blood, and in what cases [*] that exclusion has been thought to operate, hardly, and in what not. It would be unprofitable however to go into this.detail at this day, and in this Court. It is sufficient to say, that though the exclusion of the half-blood has been thought to be.a hardship in some cases, yet it has not been thought to be so in all. So well have men been satisfied with the old feudal principle, to wit: that the feud should always descend to the blood of the first feuditory; and also with that other principle, in early times engrafted upon it, to wit: that on every .newpurchase, the purchaser should hold the lands so purchased, ut feudwm, antiqmmi, as an ancient feud, that is as an estate descended to him from his remote ancestors: I say, so well satisfied have men been with these, principles, that the justice and correctness of them, have never, so far .as I know, been called in question.
Upon the exclusion of .the half-blood by the mother’s side, from an inheritance notoriously'descended from the father, no man has been dissatisfied. Nay, Blackstone himself says, that it had been thought highly reasonable. And •so also in. case the half-blood by the father’s side, had been -excluded from an inheritance notoriously descended from the mother. Because, in these cases, the land descends accord *367 ing to the feudal principle, to the blood of the first purchaser ; or, in the common mode of expression, the estate is kept in the family.
But on the other hand, when the half-blood by the father’s side is excluded from an inheritance descended from the father, or the half-blood by the mother’s side, from an inheritance descended from the mother, it has been thought a hardship because it is at least preferring a more distant to a nearer relation of the same family, and sometimes even causes the total loss of the estate by its becoming es-cheated to the lord. The total exclusion of the half-blood from the inheritance, Blackstone tells us, is a mere rule devised to aid us in investigating who was the first purchaser or feuditory, or in other words, [*] who is the nearest collateral relation descended from such first purchaser; and this rule in the case last stated, is made to defeat the very end for which it was devised. This is sacrificing the justice of the principle to the rigidity of the rule; it is destroying the substance to maintain the form.
The Legislature of New-Jersey, on examining this subject, have thought proper to change the law in this respect, and to provide a remedy for this evil, and for this purpose they have enacted, "That, whereas by the law as it now stands, the issue of an ancestor by one venter, cannot inherit to the issue of such ancestor by a different venter, whereby the real estate of an ancestor in some instances, goes out of the family to the great injury of the remaining issue of such ancestor; Fort iiemeüy whebeojf, Bo it further enacted by the authority aforesaid, That if any person possessed of, or entitled unto a real estate in his or her own right in fee simple, shall die without making a will, disposing thereof, and without any brother or sister, or any issue of such brother or sister, of the whole blood, and shall leave a brother or brothers, a sister or sisters, a brother and sister or sisters, or brothers and a sister or sisters of the half blood, the said real estate of such person shall descend to and be inherited by such kindred, as the case maybe, of the half-blood in the manner and proportions between male and female, directed by the first section of this act."
It has been said at the bar, that the enacting words of this clause are not to be restrained by the preamble thereto; and as the enacting words are general, they must appply to the half-blood generally, and in all cases.
It is true, that the preamble does not always restrain more general words in the enacting clause; but when the intention of the Legislature can be clearly ascertained, that intention will always restrain the generality of the w’ords, or *368 mother phrase, give the object upon which they arc to operate. Let us see whether we can discover this.
[*] What is the meaning of the term ancestor in the above section? It cannot mean the person last.actually seized, for by the supposition he is already dead without issue. In the case before, us, it cannot be applied to Mary Mul ford, for it would be impossible that the old rule of excluding the half-blood, should operate to the great injury of her remaining issue, she being already dead without issue, as is manifest from the case. It must mean therefore, I apprehend, him from whom, in contemplation of law, the estate has descended to such person -last seized, taking the nearest first, and so proceeding in the ascending line. The word family too, used in the section, must be taken in that sense in which the law uses it when speaking of descents, and. in that restriction it will comprehend only the descendants of such ancestor; those who have his blood running in their veins; and -in that sense, is nearly if not quite of the same import as the word issue. " -
Now if John Styles be seized of an estate of inheritance, and marry, and have a son Richard, and then marry again, and have another son Thomas by his second wife; and then die, and the estate descend to Richard, who becomes seized, and hedie without issue, the estate, by the rules of the common law, cannot go to his brother Thomas, but an heir must be sought for in the family of his paternal grandfather; so that the estate would go out of the family of John Styles, according to my construction of the word family, and to the great-injury of his remaining issue, Thomas. So if Mai’y Gray be seized of an estate of inheritance, and have issue by different husbands, on similar events the very same evil will arise.- But besides these two cases, I can conceive of none where the common law doctrine of of excluding the half-blood, could possibly cause the real estate of an ancestor to go out of the family, to the great injury of the remaining issue of such ancestor. Here, probably because it was by far the most common, the Legislature have stated only the first of these' cases, to wit: that of the half-blood by the father’s side, and the [*] evil arising from the law as it then stood, on their exclusion from the inheritance descended from their father. Whether the case of the half-blood by the mother’s side being excluded from the inheritance notoriously descended from their motliei’, being in substance, the very same thing, might not be construed to be within the equity of the statute, is a question which will be determined when it presents itself for consideration. The great and the only evil to be remedied is, that the real estate of an *369 ancestor, in some instances, goes out of the family to the great injury of the remaining issue of sncfi ancestor. Now if this evil cannot possibly be produced by the rules of the common law in any other than the two cases above stated, it seems to be an irresistible consequence that the act, in its broadest construction, can only apply to them. The Legislature have stated what they conceive to be the evil resulting from a certain principle of the common law, with respect to the exclusion of the half-blood, and they expressly say, that for the remedying this evil, it is enacted, &o. as above stated. Now to construe this act in such a manner as to produce the very evil which by express words it is intended to remedy, seems to be a strange and unwarrantable construction.
In the case before us, Mary Mulford, if she be considered as the common stock, held the estate by descent from the Mulford family, to wit, from her brother Stephen ; Stephen Mulford, if he be considered as the common stock, as is contended, being a purchaser, held it, according to a well known principle of the common law, with which this act in nowise interferes, tit feudum antiquum, as an estate descended from his ancestors, and subject precisely to the same rules of- descent, as if it had actually so descended. So that whichsoever of them be considered as the person last actually seized, it will make no diffei-ence. In either case, the ancestor is to be sought for in the family of the Mulfords, from whom the estate descended.
If the construction contended for by the plaintiffs [*] should be admitted, and the Piersons and Christies be let in to the inheritance, would this obviate the evil complained of? Would this prevent the estate of an ancestor going out of his family, and preserve it to his remaining issue? Who can possibly be considered as the ancestor of Mary Mulford, in the legal acceptation of that term ?. Can Pierson or Christie be so considered? It will not be pretended. Can Anna Mulford the mother, be so considered? Nothing can he more clear than that the law, in speaking of descents, uses the term ancestor, exclusively, to signify the person from whom the inheritance descended; but here Anna Mulford, the mother never was seized, either in law or in fact, of an estate of inheritance in the premises; she can, therefore, in no view which I have of the subject, be considered as the ancestor of whom the act speaks.
To let in the Piersons and Christies, therefore, instead of preventing the estate from going out of the family of the ancestor, and preserving it to the remaining issue of such ancestor, would actually carry it out of his family, and wrest *370 it from such, issue. It would be creating the very évil which the law is intended to prevent.
Upon the whole; the exclusion of the half-blood in this casé, is not the exclusion of the issue of an ancestor by different venters, and which it is' intended to prevent, which is the case'mentioned in the act; it does not carry the inheritance out of the family of the ancestor, according to my interpretation of the term ancestor, to the great injury of his remaining issue, which is the only evil to be remedied by the act ; but on the other hand, it keeps it out of the hands of strangers, it preserves it in the family of the ancestor, and casts it upon the rémaining issue of such ancestor, to wit: on the issue of Lewis Mulford, the grand-father of Mary Mulford, from whom it actually came. — In my opinion, therefore, there must be judgment for the defendant.
Rossell J.
The more I have considered the third [*] section of our act of Assembly, altering the descent of real estate, the more strongly I am of opinion, that our Legislature intended to. provide only for that particular mischief complained of under the old law, that “the estate in some instances, went out of the family of an ancestor,” although his child or children might be living; and that they did not intend to do away any of those ancient canons of descent, against which no complaint had been made, and to which no apparent injustice was attached. I therefore concur in the opinion just delivered by the Chief Justice.
Pennington, J.
The case is shortly this. Stephen Mulford died seized of the premises in question, subject to to the life estate of his grand-father’s widow, leaving a sister of the whole-blood, a brother and sister of the half-blood, and uncles and aunts in the paternal line. • Though Stephen Mulford was not in the actual seizin of the premises at the time of- his death, yet he being a purchaser, taking by the will of -his grand-father, he was capable of transmitting the éstate to his heirs. The estate on the death of Stephen, descended to Mary Mulford, his sister of the whole-blood.— Then Mary dies, and after her, the tenant for life dies; but as Mary was never actually seized, she cannot make the stock of a new inheritance; and if we remain in this case as at common law, as it is contended by the defendant, in order to find the heir, we must look up the heirs of Stephen, who being the person last actually seized, forms the stock of inheritance. This will cast the estate on the eldest paternal uncle of Stephen, unless our statute altering the descent of real estate makes a difference.
*371 Our statute as far as it goes, I apprehend, takes away the distinction between actual seizin and seizin in law, by using the words “possessed of or entitled to;” but I do not perceive that this distinction can make any difference in the present case. The heir at law, or the persons to take under the statute will be the same whether we consider Stephen or Mary, the stock of inheritance. [*] Nor can I perceive any distinction between this case and the case of Den v. Urison, except that in this case, the persons claming under the statute, are of the half-blood to the purchaser; in the case of Den v. Urison, they were of the half-blood to the person last seized to whom the estate had come by inheritance, from an ancester of no consanguinity with the claimants under the statute, which, in my opinion, does not alter the law of the case. If my brethren had delivered the same opinion on this point, I should have thought this case concluded by that. That not being the case, I apprehend the whole is left open. The case, in my apprehension, turns upon the simple question, can the enacting clause of a statute, laying down with perspicuity a now rule or canon of descent, be restrained by reason that the words of the preamble does not express an intent co-extensive with the rule, but not repugnant to it ? The preamble expresses a particular intent. The enacting clause lays down a general rule, which the intent expressed in the preamable is not broad enough to cover; but it must be observed that the preamble does not express an intent different from the rule as applied to this case, giving it the broadest latitude that can possibly be imagined. If I am correct in the statement of the statute, as applied to the case, (and with deference to my brethren, I do not see how it can possibly be viewed in any other light) I think that the rules laid down in the books for the construing statutes, will not permit the enacting part of a statute to be restrained in the manner contended for by the defendant’s counsel.
I have given my opinion on this question so fully in the case of Den v. Urison, that it would be useless to repeat it at this time. I am therefore, of opinion, that Mary Mulford at her death, was entitled to a vested remainder in fee of the premises in question; and that it descended by the positive provisions of our statute to John and Sarah Pierson, her brother and sister of the half-blood; that the doctrine respecting posthumous children does not apply in this case; and therefore, [*] that the plaintiff ought to have judgment «n the demises of John and Sarah Pierson.
Judgment for defendant.

 State Reports 212.

 It was contained in the written opinion received by the Reporter, with a note in the margin, that it was not delivered. The Reporter considered it as a further explanation of the reasons on which the judge grounded his opinion, and therefore did not strike it out.